IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| CRAIG & KIMBERLY THURSTON, | ) | |
| | ) | CASE NO. BK04-42317-TLS |
| Debtor(s). | ) | A06-4055-TLS |
| INTERSTATE STRUCTURES, INC., and | ) | |
| JOHN A. WOLF, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiffs, | ) | CH. 7 |
| | ) | |
| vs. | ) | |
| | ) | |
| HERITAGE BANK, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

This matter is before the court on the defendant's motion for summary judgment (Fil. #114) and resistance by the plaintiffs (Fil. #124). Marion Pruss represents the plaintiffs, and Kent E. Rauert represents the defendant. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

The motion is denied.

Interstate Structures, Inc. ("ISI") was a construction company in Kearney, Nebraska. The debtor was an officer and shareholder of ISI. To obtain additional financing, ISI negotiated with defendant Heritage Bank and took out a loan and obtained an operating line of credit in November 2003. Those loans were secured by all of ISI's assets and personally guaranteed by the debtor. In early 2004, ISI experienced significant financial difficulties. In late March and early April 2004, the debtor granted liens in his personal assets to provide additional security to the bank. In June 2004, ISI ceased business operations and its assets were liquidated and used to pay down the Heritage Bank debt. The outstanding principal balance due the bank is $976,794.02. The debtor filed his Chapter 13 petition in June 2004 and eventually converted it to a Chapter 11 case. Thereafter, he filed this adversary proceeding against Heritage Bank. When the bankruptcy case was converted to a Chapter 7, the Chapter 7 trustee was substituted as a plaintiff.

The plaintiffs alleged the following in their second amended complaint:

1. That the asset transfers to the bank in March and April 2004 constitute preferences which should be avoided;

2. That the bank's conduct in obtaining additional collateral from the debtor to protect its security position was inequitable, injuring the debtor's other creditors and conferring an unfair advantage on the bank, such that its claim should be equitably subordinated; and

3. That the bank's lien in certain ISI funds on hand and accounts receivable should be subordinated to the claim of the Nebraska Department of Revenue.

Subsequently, the preference claim was dismissed and the plaintiffs elected to abandon the third cause of action. The bank has now filed a motion for summary judgment on the basis that no genuine issue of material fact exists on the equitable subordination cause of action and the case should be dismissed as a matter of law.

Summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 868 (8th Cir. 2005); *Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397, 401 (8th Cir. 2004); *Williams v. Marlar (In re Marlar),* 267 F.3d 749, 755 (8th Cir. 2001).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The parties agree on the following material facts:

1. Kent Oelkers is an individual and is the debtor in a Chapter 7 proceeding appearing at Case No. BK04-42316.

2. Craig Thurston and Kimberly Thurston are husband and wife, and are joint debtors in a Chapter 7 bankruptcy proceeding at Case No. BK04-42317.

3. ISI was a Nebraska corporation. Mr. Oelkers and Mr. Thurston were ISI's only shareholders and directors. Mr. Oelkers also served as ISI's president and Mr. Thurston served as ISI's vice-president. ISI is not a debtor in any pending bankruptcy proceeding.

4. Heritage Bank is a Nebraska banking corporation with one of its branch offices located in Kearney, Nebraska.

5. During the fall of 2003, ISI's general manager, Kelly Rafferty, approached Heritage about providing financing for ISI's business ventures. ISI's purpose was to obtain a larger operating line of credit.

6. On November 25, 2003, the negotiations between ISI's representatives and the bank's representatives culminated in the execution of a loan commitment agreement.

7. The loan commitment agreement generally provided that Heritage would make two separate loans to ISI. The first was to be in the principal amount of $660,000.00. This loan represented a refinancing of term debt ISI had with Wells Fargo Bank as well as an additional $67,000.00 to be utilized to reduce accounts payable. The first loan was to accrue interest at 1.5 percent below the Heritage base rate. The term of the first loan was four years from its inception. The second loan was a revolving line of credit not to exceed $850,000.00. Again, the initial advance on this second note was to be utilized to payoff a similar line of credit maintained by ISI at Wells Fargo Bank. The second loan was to accrue interest at 1.5 percent below the Heritage base rate. The second loan was to mature on March 31, 2004. The agreement specifically provided that Heritage's commitment on the second loan after March 31, 2004 "will be subject to receipt and review of information as required by Heritage Bank and will be further subject to our discretion."

8. As collateral for both loans, ISI, by and through Mr. Oelkers and Mr. Thurston, agreed to pledge to Heritage a first lien in all business assets, including, but not limited to, machinery, equipment, furniture, fixtures, inventory, accounts receivable, contract rights, chattel paper, titled vehicles and trailers, and all tangible and intangible personal property, except those specific assets then financed by a third party. In addition, Mr. Oelkers and Mr. Thurston agreed to sign personal guarantees of both notes along with assigning to Heritage their various interests in "all subsidiaries and business interest, including, but not limited to, Iosty Plumbing, Triad Land Development, and KC Development."

9. The loan commitment agreement was executed by Mr. Oelkers, individually and as ISI's president. Similarly, Mr. Thurston also executed the agreement in his individual capacity and as ISI's vice-president.

10. On November 25, 2003, Mr. Oelkers and Mr. Thurston executed two separate promissory notes made payable to the order of Heritage. The first promissory note was in the principal amount of $660,000.00 with terms consistent with those described in the loan commitment agreement described in the preceding paragraphs. The second promissory note represented a line of credit not to exceed $850,000.00 with a maturity date of March 31, 2004. Simultaneous with the execution of the second promissory note, Mr. Oelkers and Mr. Thurston both signed a line of credit agreement on behalf of ISI. The remaining terms of the second promissory note and line of credit agreement were consistent with those described in the loan commitment agreement described in the preceding paragraphs including an indication in both documents that the second promissory note and line of credit expired March 31, 2004. Mr. Oelkers and Mr. Thurston acknowledge ISI's receipt of the funds represented by both loans and the terms of those loans.

11. Both promissory notes as well as the line of credit agreement indicate that both loans were to be secured by a security agreement and financing statement as well as assignments of "stock and business interests." On November 25, 2003, Mr. Oelkers and Mr. Thurston on behalf of ISI executed a blanket commercial security agreement granting Heritage a security interest in essentially all of ISI's business assets. In order to perfect its lien consistent with the commercial security

agreement, Heritage filed a financing statement with the Nebraska Secretary of State's office on November 26, 2003.

12. Mr. Oelkers and Mr. Thurston also personally guaranteed both promissory notes.

13. For reasons that are not clear at this time, Heritage failed to require either Mr. Oelkers or Mr. Thurston to follow through with assigning their interests in their various business entities at the time of execution of the promissory notes described in paragraph 10 above.

14. Prior to entering into the lending relationship with Heritage, ISI banked at and had a lending relationship with Wells Fargo Bank.

The following facts are also established by the record:

1. Mr. Oelkers and Mr. Thurston learned in February 2004 that ISI owed nearly $300,000.00 in unpaid payroll taxes to the federal and state taxing authorities, which exacerbated the company's financial difficulties.

2. Representatives of ISI and Heritage had a series of meetings in March 2004 to discuss ISI's financial situation, in light of the line of credit's expiration date of March 31, 2004.

3. One of the results of these meetings was the bank's insistence that Mr. Oelkers and Mr. Thurston assign to the bank their interests in certain personal property, including their other business interests, as contemplated in the loan commitment agreement signed on November 25, 2003.

The debtor argues that the bank's claim should be subordinated pursuant to 11 U.S.C. § 510(c) based on the bank's alleged inequitable conduct in causing the debtor to incur personal debt to maintain ISI's operations and to grant liens in his personal property to secure ISI's debt. Specifically, the debtor alleges that Heritage obtained those liens through misrepresentations. Section 510(c) provides that "after notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of an allowed interest."

The purpose of equitable subordination is to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 415 (Bankr. E.D. Ark. 2005) (quoting *Bostian v. Schapiro (In re Kansas City Journal-Post Co.)*, 144 F.2d 791, 800 (8th Cir. 1944)). The court's power to exercise equitable subordination is limited; it is "not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but [is] limited to what the Bankruptcy Code itself provides." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 24-25 (2000). Therefore, courts have identified certain principles to guide decisions regarding equitable subordination:

> First, "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related

> to the acquisition or assertion of that claim." *Mobile Steel*, 563 F.2d at 700. Second, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Id.* at 701. And third, the objecting party must come forward with enough evidence to "'overcome the claimant's prima facie case and thus compel him to actually prove the validity and honesty of his claim.'" *Id.* (quoting 3A J. Moore & L. King, *Collier on Bankruptcy*, ¶ 63.06, at 1785 (14th ed. 1976)).

*Hoffinger*, 327 B.R. at 414-15.

Equitable subordination of one claim in favor of another generally requires (1) some inequitable conduct by the claimant; (2) resulting in injury to other creditors or conferring an unfair advantage on the claimant; and (3) an outcome from the subordination that is not inconsistent with other provisions of the Bankruptcy Code. *Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan v. M & S Grading, Inc. (In re M & S Grading, Inc.)*, 541 F.3d 859, 866 (8th Cir. 2008); *Kaler v. Bala (In re Racing Servs., Inc.)*, 386 B.R. 751, 755 (B.A.P. 8th Cir. 2008). The issue is whether the creditor's harmful conduct was directed at other creditors. *Slefco v. First Nat'l Bank of Stuttgart (In re Slefco)*, 107 B.R. 628, 644 (Bankr. E.D. Ark. 1989). First, there has to be some showing of inequitable conduct. "Inequitable conduct has been regarded as a wrong or unfairness or, 'at the very least, a masquerade of something for what it is not.'" *Jacoway v. Dept. of Treasury-IRS (In re Graycarr, Inc.)*, 330 B.R. 741, 749 (Bankr. W.D. Ark. 2005) (quoting *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997)). Inequitable conduct typically falls into one of the following categories: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the creditor's use of the debtor as a mere instrumentality or alter ego. *Graycarr* at 749 (citing *Lifschultz* at 344-45).

In a case where the creditor, a corporate seller of a grocery store, closely controlled the debtor-buyer's activities and bank accounts to ensure it received payment before any other creditor, the South Dakota bankruptcy court found inequitable conduct.

> [The seller] directed the [buyer] to string out trades payable creditors under threat of cutting off credit and taking back the store. The [buyer], with no other source of credit, caved in to [the seller's] demands. [The seller] ordered the [buyer] to not pay trades payable timely, telling [the buyer] a . . . loan was coming soon. . . .
> [The seller] used its debit power and deferred payment to trades payable not merely to protect its investment, but to leverage its recovery at the expense of other creditors. . . . [Seller]'s inequitable behavior establishes a breach of the multitude of rules of fair play and good conscience, including overreaching. . . .

*Pokela v. Red Owl Stores, Inc. (In re Dakota Country Store Foods, Inc.)*, 107 B.R. 977, 994 (Bankr. D.S.D. 1989).

In the *Slefco* case in Arkansas, the lender took steps to increase its security position while leading the debtor to believe the bank would lend a larger amount than it actually intended to. In subordinating the bank's claim, the court found that the bank's misrepresentations caused the debtor and its partners to pledge all their assets to the bank and let trade creditors go unpaid, with the result

that no unencumbered assets remained with which to pay the unsecured creditors. This amounted to inequitable conduct by the lender. 107 B.R. at 644.

A finding of inequitable conduct is fact-specific, as is clear from comparing the following holding with the cases cited above:

> Plaintiffs assert that Defendants acted inequitably by obtaining a security interest in all of the Debtor's assets at a time when Defendants knew the Debtor was insolvent and could not obtain a loan from any other lender. The Court finds that this conduct is insufficient to warrant subordination of Defendants' claim. Historically, Defendants had already made substantial capital contributions to the Debtor. At the time the bridge loans were granted, Debtor expected to receive significant funds from the sale of assets from its Belgian subsidiary. That Defendants would ask for collateral to secure an additional advance is not unreasonable, and fails to rise to the level of inequitable conduct necessary to subordinate their claim.

*Farr v. Phase-I Molecular Toxicology, Inc. (In re Phase-I Molecular Toxicology, Inc.)*, 287 B.R. 571, 581 (Bankr. D.N.M. 2002).

In the present case, the debtor alleges that Heritage led him to believe it would assist ISI in working out its financial situation, including making additional loans or advances as necessary, in exchange for the additional collateral he signed over. In fact, according to the debtor, Heritage had no intention of enabling ISI to stay in business and wanted only to protect its own security position. Debtor further asserts that the bank was so concerned about recovering as much as possible that it allegedly had to personally approve every check ISI issued after April 1, 2004. Heritage, on the other hand, denies making any promises or representations regarding ISI and points out that it made advances of more than $174,000.00 to ISI after renewing the loans and receiving additional collateral.

Intent is a factual issue which is not readily resolved on summary judgment. The parties' competing interpretations of the facts indicate a genuine and material dispute and preclude the entry of summary judgment.

IT IS ORDERED: The defendant's motion for summary judgment (Fil. #114) is denied. Trial of this matter will commence at 9 a.m. on December 17, 2008, in Lincoln, Nebraska.

DATED: November 6, 2008.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    Marion Pruss
    John A. Wolf
    *Kent E. Rauert
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.